**FILED**

**JAN 2 8 2011**

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

DR. KASIPPILLAI MANOHARAN,
London, UK

KALAISELVI LAVAN,
1247 SW 149 Lane
Sunrise, FL, 33326, U.S.A.

and JEYAKUMAR AIYATHURAI,
41 Robbins Rd. South
Millstone, NJ 08510

*Plaintiffs,*

vs.

PERCY MAHENDRA RAJAPAKSA,
"Temple Trees"
Colombo, Sri Lanka

*Defendant.*
_____/

Case: 1:11-cv-00235
Assigned To : Kollar-Kotelly, Colleen
Assign. Date : 1/28/2011
Description: PI/Malpractice

CIVIL ACTION NO. _____

*JURY ACTION*

## COMPLAINT

Plaintiffs, KASIPPILLAI MANOHARAN, KALAISELVI LAVAN, and

JEYAKUMAR AIYATHURAI, through their undersigned attorney, hereby file

this Complaint against Defendant, PERCY MAHENDRA RAJAPAKSA, in his

individual capacity and official capacity as President of Sri Lanka, stating claims

arising under the Torture Victims Protection Act of 1991, Pub. L. 102–256, 106

Stat. 73 (Mar. 12, 1992) ("TVPA"). The Plaintiffs allege the following:

COMPLAINT - 1

## SUBJECT MATTER JURISDICTION

1. This Court enjoys subject matter jurisdiction over this action under 28 U.S.C. 1331 because Plaintiffs' claims arise under the Torture Victims Protection Act of 1991, Pub. L. 102–256, 106 Stat. 73 (Mar. 12, 1992)

## PERSONAL JURISDICTION AND VENUE

2. This Court enjoys personal jurisdiction over Defendant because the claims arose from a tortious act or omission in the District of Columbia. D.C. Code Ann. Sec. 13-423(a)(3) (1981). TVPA violations constitute universal torts under international law.   Venue is proper under 28 U.S.C. § 1391(e).

## PARTIES

3. Plaintiff, DR. KASIPPILLAI MANOHARAN ("DR. MANOHARAN"), is the legal representative of his deceased son, Ragihar Manoharan, under applicable law.  The son was one of five (5) twenty (20) year old graduates of Sri Koneswara Hindu College that were beaten and killed extra-judicially by Sri Lankan security forces under the command responsibility and control of Defendant.  The five extrajudicial killings under color of foreign law occurred in Trincomalee, Sri Lanka, on January 2, 2006 at approximately 7:30pm – 8:30pm.  Both Plaintiff father and son were Sri Lankan Tamils, an ethnic minority in Sri Lanka.   Plaintiff DR. MANOHARAN is a resident of London, UK.

4. Plaintiff, KALAISELVI LAVAN, is the legal representative of her deceased first husband, Premas Anandarajah, under applicable law. At all times relevant to this Complaint, Premas Anandarajah was one of seventeen (17) humanitarian aid workers employed by the neutral organization Action Contre La Faim ("Action Against Hunger" or "ACF") to distribute food rations and to coordinate reconstruction efforts in Muttur, Sri Lanka, to aid Tamil civilians devastated by decades of an ethnic civil war. All seventeen (17) ACF employees in Muttur were victims of extrajudicial killings under color of foreign law on August 4, 2006 perpetrated by Sri Lankan military or paramilitary forces under the command responsibility of Defendant. Plaintiff LAVAN's relatives in Sri Lanka are now itinerant due to fear of persecution by the Defendant. Plaintiff KALAISELVI LAVAN is resides at 1247 SW 149 Lane, Sunrise, FL 33326.

5. Plaintiff, JEYAKUMAR AIYATHURAI, is the legal representative of his Aunt, Parameswary Thavarajah, her daughter, Vijeyamala Thevarajah, her daughter's husband, Thavarajah Thevarajah, and her granddaughter, Kethika Thevarajah (hereinafter "the Thevarajahs"), under applicable law. At all times relevant to this Complaint, the Thevarajahs were civilians unaffiliated with government security forces or militant organizations. On or about May 14, 2009, the Thevarajahs were victims of extrajudicial killings under color of foreign law by Sri Lankan security forces under the command and control of the Defendant in a clearly demarcated civilian

zone. Plaintiff AIYATHURAI resides at 41 Robbins Rd. South, Millstone, NJ 08510.

6. Defendant, PERCY MAHENDRA ("MAHINDA") RAJAPAKSA, is the President of Sri Lanka. He is a Sinhalese Buddhist, the largest ethnic group in Sri Lanka approximating seventy-seven percent of the population. He was first elected President in November 2005, and he has held that office at all times relevant to this Complaint. Defendant, de facto or de jure, exerts virtually unlimited government power in Sri Lanka. At all times relevant to this Complaint, Sri Lanka's armed forces or security personnel did nothing without Defendant's express, implicit, or delegated authorization. Throughout his presidency, Defendant RAJAPAKSA has exercised command responsibility over the Sri Lankan armed forces or security services directly, through his brother and Defense Secretary, Gotabaya Rajapaksa, or otherwise. Defendant knew or should have known of the extrajudicial killings under color of foreign law of Ragahir Manohoran, Premas Anandarajah and the Thevarajahs by the Sri Lankan armed forces or security services before the fact, or knew or should have known the perpetrators of the extrajudicial killings after the fact and refused to bring them to justice. Defendant has politically compromised the Sri Lankan judiciary, which is not independent of Defendant. Accordingly, any effort by the Plaintiffs to secure a remedy for the extrajudicial killings at issue in this Complaint in Sri Lanka would be futile.

## STATEMENT OF FACTS

7.   Continuing a pattern of ethnic oppression of Sri Lankan Tamil civilians by
Sinhalese Buddhists manifest at the dawn of Sri Lankan's independence in
1948, Defendant's presidency has been earmarked by a pattern of gross
violations of internationally recognized human rights, including war crimes,
rape, torture, inhumane or degrading treatment and punishment, prolonged
detention without charges, and other flagrant denials of life, liberty, and
personal security.   Sri Lankan Tamils have been the primary targets of
Defendant's state sponsored criminality.   Defendant has blocked any
objective investigation into alleged violations of internationally recognized
human rights by appropriate international organizations including, but not
limited to, Action Against Hunger, the International Committee of the Red
Cross, Amnesty International, the International Commission of Jurists, and
groups or persons under the authority of the United Nations or the
Organization of American States.   Indeed, there has not been a single
complete investigation or prosecution of known perpetrators of
extrajudicial killings under color of foreign law that targeted Sri Lankan
Tamil civilians or humanitarian aid workers assisting Tamil civilians since
the commencement of Defendant's presidency.

8. The following is an inexhaustive chronicle of international law violations authorized by Defendant and public statements specifically bringing the crimes to his attention.

9. On or about December 24, 2005 around 1:20 a.m., Sri Lankan police or Sri Lankan military personnel or government-sponsored paramilitaries murdered by gunfire Batticaloa district Member of Parliament (MP) of the Tamil National Alliance (TNA) Joseph Pararajasingam in St-Mary's co-cathedral in Batticaloa town, Batticaloa district.

10. On or about June 9, 2006, Sri Lankan military personnel or government-sponsored paramilitaries murdered with sharp objects a Tamil family of four (4), including lynching the seven (7) year old and (9) year old children, in the areas of Thomaspura Ward No. 10 in Vankalai in Mannar district.

11. On or about August 10, 2006 around 7:30AM, the Sri Lankan Air Force aerially bombarded the Senchcholai complex in Vallipunam of Mullaithivu district, murdering over fifty-seven (57) Tamil girls.

12. On or about November 10, 2006 around 8:30am, Sri Lankan police or Sri Lankan military personnel or government-sponsored paramilitaries on motorcycle murdered by gunfire Jaffna district Member of Parliament (MP) of the Tamil National Alliance (TNA) Nadarajah Raviraj in areas near the residence of Nadarajah Raviraj in Manning Town in Narahenpitiya, Colombo district.

13. On or about May 13, 2007, Sri Lankan military personnel or government-sponsored paramilitaries murdered a Tamil family of four (4), including a four (4) year old Tamil child and a four (4) month old Tamil child, in the areas of Allaipitti in Mandaithivu islet in the Jaffna peninsula.

14. On or about September 7, 2008, Sri Lankan military personnel or government sponsored paramilitaries abducted, bound at the hands and legs, tortured, and decapitated Rasiah Laxahan in the areas of Mandan Karaveddi in Jaffna district.

15. On or about October 3, 2008, Sri Lankan military personnel or government sponsored paramilitaries abducted, tortured, and strangled to death Kandia Christie Rajah in the areas along Fifth Lane at Vaiaravappuliyankjulam in Vavuniya Police Division in Vavuniya district.

16. On or about December 13, 2008 around 9:30am, Sri Lankan military personnel launched an artillery shell attack which decapitated and murdered five (5) month Tamil immigrant Jeyarooban Ajanthan, in the areas near or inside a Tamil IDP settlement near Takrap-Pilliyar temple on Hudson Road in Vaddakkachchi of Killinochi district.

17. On or about January 17, 2009, Sri Lankan military personnel murdered by gunfire three (3) Hindu-Christian North East Sri Lankan Tamil civilians on Piramanthanaa-Visuvamadu road in Kilinochchi district.

18. On February 5, 2009, Sri Lankan military personnel or government sponsored paramilitaries murdered by gunfire at least sixteen (16) Hindu-

Christian North-East Sri Lankan Tamils inside the Defendant's designated "safe zone" in Mullaithivu.

19. On or about February 7, 2009, Sri Lankan military personnel or government sponsored paramilitaries strangled to death the ninety-four (94) year old Hindu North-East Sri Lankan Tamil wife of a Tamil Saiva priest in her home in Irupaalai, Koappaay.

20. On February 12, 2009, around 11:30 am near Asdiyapaatham Road near Thirunelveali junction in Jaffna district, Sri Lankan military personnel murdered by gunfire two (2) Hindu-Christian North-East Sri Lankan Tamil youths.

21. Several former U.S. Ambassadors to Sri Lanka have written: "Some have suggested that these events have been carried out not by elements of the Government, but by other forces hoping to embarrass the Government. We do not find such arguments credible." Ambassador A. Peter Burleigh, Ambassador Shaun Donnelly, Ambassador Ashley Wills, Ambassador Jeffrey Lunstead, "Letter to President Mahinda Rajapaksa," January 19, 2009, available at http://omiusajpic.org/files/2009/02/lunsteadtestimony090224p1.pdf, last visited January 26, 2011.

22. On or about March 13, 2009, U.S. Secretary of State Hillary Clinton told Defendant by telephone that Washington was deeply concerned about deteriorating conditions and increasing loss of life in government-

designated safe areas.  BBC News, "UN fears Sri Lanka 'war crimes,'
March         13,         2009,         available         at
http://news.bbc.co.uk/2/hi/south_asia/7942051.stm, last visited January 26,
2011.

23. According   to   the   incumbent   U.S.   Ambassador   to   Sri   Lanka,
"...accountability has not been a high-profile issue in the presidential
election -- other than President Rajapaksa's promises personally to stand up
to any international power or body that would try to prosecute Sri Lankan
war heroes. While regrettable, the lack of attention to accountability is not
surprising. There are no examples we know of a regime undertaking
wholesale investigations of its own troops or senior officials for war crimes
while that regime or government remained in power. In Sri Lanka this is
further complicated by the fact that **responsibility for many of the alleged
crimes rests with the country's senior civilian and military leadership,
including President Rajapaksa and his brothers and opposition
candidate General Fonseka.**"  Ambassador Patricia A. Butenis, "Sri
Lanka War Crimes Accountability: The Tamil Perspective," January 15,
2010,  available  at  http://www.guardian.co.uk/world/us-embassy-cables-
documents/243811, last visited January 26, 2011.

### THE TRINCOMALEE FIVE ("TRINCO FIVE")

24. On January 5, 2006, members of the Sri Lankan Army ("SLA"), Navy
("SLN"), Police, or Special Task Force ("STF") under the command

responsibility of Defendant RAJAPAKSA beat and perpetrated extrajudicial killings under color of foreign law of five (5) ethnic civilian Tamil students, including Raghiar Manoharan. The extrajudicial killings of the student civilians were unprovoked. The student victims were not on a battlefield, and were not and had not engaged in hostilities against the Government of Sri Lanka. The extrajudicial killings violated clearly established laws of war. They were a premeditated part of a systematic endeavor by the Defendant to destroy Tamils in whole or in substantial part specifically because of their ethnicity or religion.

25. Raghiar Manoharan had never been a member of the LTTE, which was a legal organization at the time of his extrajudicial killing under a Cease Fire Agreement ("CFA") between the LTTE and the Government of Sri Lanka. Nor was Raghiar affiliated with any political organization, violent or otherwise.

26. On January 2, 2006, Raghiar Manoharan was one (1) of at least seven (7) students engaged in conversation beside a statue of Mahatma Gandhi in a section of Trincomalee controlled by the Sri Lankan Navy. At approximately 7:35pm, a grenade was detonated amidst the group from a green motor rickshaw. Five (5) of the seven (7) students were injured in the explosion. Raghiar Manoharan was one (1) of two (2) students who were initially unharmed.

27. The green motor rickshaw fled unhindered through a military checkpoint and disappeared into Fort Frederick, an outpost of the Sri Lankan Army. After the rickshaw departed, military controlled checkpoints in the area were immediately closed. For the following half-hour, the future scene of extrajudicial killings of five Tamil student civilians including Raghiar was quarantined.

28. Several minutes after the grenade detonation, a Jeep approached the students, which included Raghiar Manorharan. The Jeep carried several masked passengers in military or security personnel uniforms. After a brief exchange, the students were heard screaming and begging for mercy by persons nearby. At approximately 7:55pm on January 2, 2006, the masked men hustled the injured students into their truck, beat them, threw them to the ground, and fired on them with automatic weapons. The two (2) uninjured students were executed on the ground. All told, five (5) of the students, including Raghiar, died in extrajudicial killings perpetrated under color of foreign law by members of Sri Lankan security forces under the command and control of Defendant.

29. After hearing the grenade blast, Plaintiff Dr. MANOHARAN became concerned about Raghiar's safety. He immediately departed for the Gandhi statue, where Raghiar and his friends often gathered. He was stopped outside the area at an SLA checkpoint.

30. Plaintiff MANOHARAN was instructed by an SLA officer to search the nearby hospital for his son, which he did. He identified his son among the dead, and observed a gaping hole of two to two and a half (2-2.5) inches at the back of his head. Arthur Tveiten, the local head of the Sri Lankan Monitoring Mission ("SLMM"), who was also present at the hospital after the extrajudicial killing of Raghiar Manoharan, exclaimed, "This is murder. These boys have not been killed by an explosion, these are gunshot wounds."

31. Plaintiff MANOHARAN was asked by a police officer at the hospital to sign a statement to the effect that Raghiar had been a member of the LTTE as a condition of retrieving Raghiar's corpse for burial. The Plaintiff refused to sign and maintained his son's distance from the LTTE. Raghiar's body was eventually released to the Plaintiff Dr. MANOHARAN without the latter's confessing to a blatant falsehood.

32. The scene of the extrajudicial killing of Raghiar was not cordoned off until January 3, 2006. The local police were instructed by Defendant directly or through agents, including Defense Secretary Gotabaya Rajapaksa, to desist from a genuine investigation of the extrajudicial killings of Raghiar and other Tamil civil students of the "Trinco Five."

33. On the evening of January 10, 2006, Plaintiff Dr. MANOHARAN received a telephone call from the Harbor Police, requesting that he provide a statement about a recent assault on him. At the Harbor Police

Headquarters, the Plaintiff Dr. MANOHARAN met with a man named Saffir, who told him that Raghir had instructed his son in Table Tennis. Saffir believed that Raghir's instruction enabled his son to become a "Northeast Champion." Saffir then stated: "We did not do this, doctor, STF did this murder, don't think it was our police."

34. After repeated public demands by Plaintiff MANOHARAN, Defendant began an investigation into the Trincomalee Massacre and extrajudicial killings. But the investigation was a sham. It was subsequently abandoned. Nothing has been done by the Defendant since to identify or prosecute the perpetrators of the extrajudicial killing under color of foreign law of Raghiar Manoharan by members of Sri Lanka's Armed Forces or security personnel under the command and control of Defendant.

35. Plaintiff MANOHARAN was forced to flee Sri Lanka due to the threat to his life caused by his determined requests for investigations into his son's extrajudicial killing.

36. Defendant knew or had reason to know of the extrajudicial killing of Raghiar Manoharan by persons under his command and control before the fact yet did nothing to stop it, or Defendant knew or had reason to know of the perpetrator of the extrajudicial killing under his command and control after the fact but did nothing to punish the perpetrator. Defendant willfully ignored or personally blocked any investigation to identify or prosecute the

perpetrators of the Trinco Five extrajudicial killings under color of foreign

law.

## THE MUTTUR MASSACRE

37. On or about August 5, 2006 at around 7:50pm, Sri Lankan military

personnel or government-sponsored paramilitaries executed, by gunfire,

seventeen (17) clearly demarcated civilian aid workers employed by

ACF in the Sri Lankan town of Muttur.

38. ACF describes itself as follows:

> **Action Against Hunger | ACF International** is a global humanitarian organization committed to ending world hunger. Recognized as a leader in the fight against malnutrition, ACF saves the lives of malnourished children while providing communities with access to safe water and sustainable solutions to hunger. With 30 years of expertise in emergency situations of conflict, natural disaster, and chronic food insecurity, ACF runs life-saving programs in some 40 countries benefiting five million people each year.
>
> ACF's 4,600 professionals work in over 40 countries to carry out innovative, life-saving programs in nutrition, food security & livelihoods, and water, sanitation, & hygiene. ACF's humanitarian programs directly assist some five million people each year, along with countless others through capacity building programs in collaboration with government ministries. Committed to principled humanitarian action, Action Against Hunger restores dignity, self-sufficiency, and independence to vulnerable populations around the world. (ACF International, "Who We Are," January 24, 2011, available at http://www.actionagainsthunger.org/who-we-are/acf-international-network, last visited January 24, 2011).

39. The International Charter of ACF describes it as a strictly neutral

organization.  Their website elaborates:

> **Independence**

Action Against Hunger acts according to its own principles in order to maintain its moral and financial independence. Action Against Hunger's actions are not defined in terms of domestic or foreign policies, nor does the organization act in the interest of any government.

**Neutrality**

Action Against Hunger maintains a strict political and religious neutrality. Nevertheless, Action Against Hunger can denounce human rights violations it witnesses as well as obstacles put in the way of its humanitarian activities.

**Non-Discrimination**

A victim is a victim. Action Against Hunger rejects all discrimination based on ethnicity, nationality, opinion, race, religion, sex, or social class." (ACF International, "International Charter," January 24, 2011, available at http://www.actionagainsthunger.org/who-we-are/international-charter, last visited January 24, 2011).

40. In accordance with its strict neutrality policy, ACF did not support either the LTTE or the Government of Sri Lanka during a protracted ethnic civil war which concluded in May 2009. At all times relevant to this Complaint, ACF maintained offices in Trincomalee, Muttur, and elsewhere in Sri Lanka exclusively to facilitate aid to penurious or endangered Sri Lankan civilians.

41. On the mornings of July 31st and August 1st, 2006, seventeen (17) ACF aid workers were dispatched from Trincomalee to Muttur to implement and supervise humanitarian aid efforts there. The team was scheduled to return on August 1, 2006. LTTE forces attacked Muttur before the team was able to withdraw. ACF's Trincomalee office was ordered to maintain radio

contact with the Muttur compound to ensure the stranded team's safety and to coordinate potential evacuation efforts.

42. By the end of August 2, 2006, prompt evacuation of the ACF team appeared unlikely. Accordingly, the Muttur team emblazoned their compound with obvious signs of their neutrality and status as a foreign humanitarian aid organization. The Trincomalee office reestablished radio contact with the team every half-hour.

43. On or about August 2006, ACF representatives provided Sri Lankan Army, Navy, and Police forces under the command authority of the Defendant with the precise location (in longitude and latitude) of their Muttur compound. ACF also reaffirmed its neutrality and reminded Sri Lankan military officials under the command of the Defendant of its peaceful humanitarian mission.

44. ACF lost radio contact with the team after 7:00am on August 4, 2006. This prompted ACF to immediately initiate an emergency evacuation plan. But the evacuation convoy was turned back at gunpoint at an SLA controlled checkpoint ten (10) kilometers from Muttur.

45. On August 5, 2006 ACF made a second attempt to evacuate its team from Muttur, this time in collaboration with the Sri Lankan Monitoring Mission ("SLMM"), another neutral humanitarian organization endeavoring to enter Muttur. Once again, the convoy was halted at an SLA checkpoint.

46. Repeated denial of ACF access to Muttur by Defendant was designed to obstruct attempts to identify the perpetrators of extrajudicial killings under color of foreign law of seventeen ACT civilian humanitarian aid workers.

47. On August 6, 2006, a convoy sent by the Consortium of Humanitarian Agencies ("CHA") succeeded in reaching Muttur by road. The CHA convoy discovered the corpses of fifteen (15) of the seventeen (17) stranded ACF employees lying immediately behind the gate of the compound. The corpses of the two (2) remaining ACF employees were found further from the gate.

48. Firearm injuries caused the deaths of the victims.

49. The seventeen (17) ACF employees in Muttur were civilian, non-battlefield victims of extrajudicial killings under color of foreign law executed by members of the Sri Lankan Police, Army, Navy, or other military or paramilitary forces under the command and control of the Defendant on August 4, 2006.

50. The ACF demanded an investigation into the seventeen extrajudicial killings of its members under color of foreign law. But the investigation conducted by Defendant was a sham for the purpose of protecting the perpetrators under Defendant's command and control from legal accountability. It was disbanded before identifying the perpetrators.

51. Premas Anandarajah was one of the seventeen ACF victims of extrajudicial killings under color of foreign law by the Sri Lankan Armed

Forces or security services on or about August 4, 2004.  He was killed in a clearly demarcated civilian zone by persons under the command or control of Defendant.

52.  Defendant knew or had reason to know of the extrajudicial killing of Premas Anandarajah before the fact but did nothing to prevent the crime, or Defendant knew or should have known of the perpetrator of the crime after the fact but frustrated all efforts to bring the perpetrator to justice.  Any effort by Plaintiff Lavan to obtain a judicial remedy for the extrajudicial killing of her husband Premas Anandarajah in Sri Lanka would be futile because the courts there are politically compromised and Lavan would be killed if she set foot there.

## THE SLAUGHTER IN MULLAITHTHEEVU

53. During May of 2009, ships manned by the SLN intentionally opened fire on known Tamil civilians bunkered in a clearly demarcated "no fire zone" on Mullivaikaal, a narrow strip of land near the eastern shore of Mullaiththeevu.

54. The Thevarajahs, all Sri Lankan Tamil civilians, were among the victims of the extrajudicial killings under color of foreign law perpetrated in the attack.

55. The Thevarajahs hailed from Kilinochchi.  They were displaced several times during the ethnic civil war in Sri Lanka.

56. The Thevarajahs were four (4) of more than three hundred thousand (300,000) ethnic Tamils herded into a Defendant demarcated "No Fire Zone" on a thin strip of land referred to as Mullivaikaal.

57. At the time of the attack, Defendant's security forces, including the SLA and the SLN, operated in or around Mullivaikaal under the command responsibility of Defendant RAJAPAKSA.

58. The Thevarajahs took refuge in a makeshift bunker to shield them from SLN bombardments. But on May 14, 2009, an artillery shell fired by the SLN hit their bunker, killing three (3) Thevarajahs and several other displaced Tamil civilians.

59. Thavarajah Thevarajah was one temporary survivor of the May 14, 2009 extrajudicial killings under color of foreign law perpetrated by the SLN. The Red Cross removed him to the Anuradhapura hospital, where he died from his wounds on June 17, 2009.

60. The deaths of the Thevarajahs were extrajudicial killings of innocent civilians under color of foreign law outside of a conflict zone during wartime by members of the Sri Lankan Armed Forces or security services under the command or control of Defendant RAJAPAKSA in violation of international law and the TVPA.

61. Defendant RAJAPAKSA knew or had reason to know of the extrajudicial killings of the Thevarajahs before the fact but did nothing to prevent the crimes, or Defendant knew or should have known the perpetrator of the

extrajudicial killings under color of foreign law of the Thevarajahs after the fact but did nothing to bring the perpetrators in the SLN to justice.

62. Any effort by Plaintiff AIYATHURAI to obtain a judicial remedy for the extrajudicial killings of his Thevarajah relatives in Sri Lanka would be futile because the courts there are politically compromised and under the control of Defendant.. Further, Plaintiff AIYATHURAI's would be killed if he set foot in Sri Lanka.

## COUNT I:  TORTURE VICTIMS PROTECTION ACT VIOLATION

63. The Plaintiffs re-allege paragraphs 1-62.

64. Under applicable law, Plaintiff KASIPPILLAI MANOHARAN is the legal representative of his son, Raghiar Manoharan, who was the victim of an extrajudicial killing under color of foreign law under the command and control of Defendant.

65. Raghiar Manoharan was a civilian killed by SLA or other Sri Lankan security forces outside of any battlefield and without any legitimate military objective. The killing constituted a war crime under international law.

66. Defendant RAJAPAKSA, as President of Sri Lanka, exercised command responsibility over the SLA and all other Sri Lankan security forces at all times relevant to this Complaint either directly, through his brother, Sri Lankan Defense Secretary Gotabaya Rajapaksa, or otherwise.

67. Defendant RAJAPAKSA knew or should have known that the extrajudicial killing of Raghiar Manoharan would take place under color of Sri Lankan

law and would constitute a war crime before the fact, but made no effort to prevent the crime; or, the Defendant knew or should have known about the extrajudicial killing of Raghiar Manoharan after the fact but did nothing to punish the perpetrators.

68. Seeking a remedy for the extrajudicial killing of Raghiar Manoharan in Sri Lanka would be futile because Defendant RAJAPAKSA has politically compromised the judicial system there. Further, the Plaintiff, or his agents, would risk death by setting foot in Sri Lanka.

69. The extrajudicial killing of Raghiar Manoharan violated the Torture Victims Protection Act of 1991, Pub. L. 102-256, 106 Stat. 73 (Mar. 12, 1992). The killing has proximately caused cognizable damage to the Plaintiff Manoharan in excess of $5 million.

## COUNT II:  TORTURE VICTIMS PROTECTION ACT VIOLATION

70. The Plaintiffs re-allege paragraphs 1-69.

71. Plaintiff KALAISELVI LAVAN is the legal representative of her deceased first husband, Premas Anandarajah, under applicable law.

72. Premas Anandarajah was a civilian aid worker and a victim of an extrajudicial killing under color of foreign law by SLA or other Sri Lankan security forces outside of any battlefield and without any legitimate military objective. The killing constituted a war crime under international law and a violation of the TVPA.

COMPLAINT - 21

73. Defendant RAJAPAKSA, as President of Sri Lanka, exercised command responsibility over the SLA and all other Sri Lankan security forces at all times relevant to this Complaint either directly, through his brother, Sri Lankan Defense Secretary Gotabaya Rajapaksa, or otherwise.

74. Defendant RAJAPAKSA knew or should have known that the extrajudicial killing of Premas Anandarajah would take place under color of Sri Lankan law and would constitute a war crime before the fact, but made no effort to prevent the crime; or, the Defendant knew or should have known about the extrajudicial killing under color of foreign law of Premas Anandarajah after the fact but did nothing to punish the perpetrators.

75. Seeking a remedy for the extrajudicial killing of Premas Anandarajah in Sri Lanka would be futile because Defendant RAJAPAKSA has politically compromised the judicial system there.  Further, the Plaintiff, or her agents, would risk death by setting foot in Sri Lanka.

76. The extrajudicial killing of Premas Anandarajah violated the Torture Victims Protection Act of 1991, Pub. L. 102–256, 106 Stat. 73 (Mar. 12, 1992).  The killing has proximately caused cognizable damage to the Plaintiff in excess of $5 million.

## COUNT III: TORTURE VICTIMS PROTECTION ACT VIOLATION

77. The Plaintiffs re-allege paragraphs 1-76.

78. Plaintiff JEYAKUMAR AIYATHURAI is the legal representative of his deceased relative, Parameswary Thavarajah, who was the victim of an extrajudicial killing, under applicable law.

79. Parameswary Thavarajah was a civilian killed by the SLN or other Sri Lankan security forces outside of any battlefield and without any legitimate military objective. Her killing constituted a war crime under international law and a violation of the TVPA.

80. Defendant RAJAPAKSA, as President of Sri Lanka, exercised command responsibility over the SLN and all other Sri Lankan security forces at all times relevant to this Complaint either directly or through his brother, Sri Lankan Defense Secretary Gotabaya Rajapaksa, or otherwise.

81. Defendant RAJAPAKSA knew or should have known that the extrajudicial killing of Parameswary Thavarajah would take place under color of Sri Lankan law and would constitute a war crime before the fact, but made no effort to prevent the crime; or, the Defendant knew or should have known about the extrajudicial killing of Parameswary Thavarajah after the fact but did nothing to punish the perpetrators.

82. Seeking a remedy for the extrajudicial killing of Parameswary Thavarajah in Sri Lanka would be futile because Defendant RAJAPAKSA has politically compromised the judicial system there. Further, the Plaintiff AIYATHURAI, or his agents, would risk death by setting foot in Sri Lanka.

83. The extrajudicial killing of Parameswary Thavarajah violated the Torture Victims Protection Act of 1991, Pub. L. 102–256, 106 Stat. 73 (Mar. 12, 1992).   The killing has proximately caused cognizable damage to the Plaintiff in excess of $5 million.

**COUNT IV: TORTURE VICTIMS PROTECTION ACT VIOLATION**

84. The Plaintiffs re-allege paragraphs 1-83.

85. Plaintiff JEYAKUMAR AIYATHURAI is the legal representative under applicable law of his deceased relative, Vijeyamala Thevarajah, who was the victim of an extrajudicial killing.

86. Vijeyamala Thevarajah was a civilian killed by the SLA or other Sri Lankan security forces outside of any battlefield and without any legitimate military objective.   Her killing constituted a war crime under international law and a violation of the TVPA.

87. Defendant RAJAPAKSA, as President of Sri Lanka, exercised command responsibility over the SLA, SLN, and all other Sri Lankan security forces at all times relevant to this Complaint either directly or through his brother, Sri Lankan Defense Secretary Gotabaya Rajapaksa.

88. Defendant RAJAPAKSA knew or should have known that the extrajudicial killing of Vijeyamala Thevarajah would take place under color of Sri Lankan law and would constitute a war crime before the fact, but made no effort to prevent the crime; or, the Defendant knew or should have known

about the extrajudicial killing of Vijeyamala Thevarajah after the fact but did nothing to punish the perpetrators.

89. Seeking a remedy for the extrajudicial killing of Vijeyamala Thevarajah in Sri Lanka would be futile because Defendant RAJAPAKSA has politically compromised the judicial system there.   Further, the Plaintiff AIYATHURAI, or his agents, would risk death by setting foot in Sri Lanka.

90. The extrajudicial killing of Vijeyamala Thevarajah violated the Torture Victims Protection Act of 1991, Pub. L. 102–256, 106 Stat. 73 (Mar. 12, 1992).   The killing has proximately caused cognizable damage to the Plaintiff in excess of $5 million.

## COUNT V: TORTURE VICTIMS PROTECTION ACT VIOLATION

91. The Plaintiffs re-allege paragraphs 1-90.

92. Plaintiff JEYAKUMAR AIYATHURAI is the legal representative under applicable law of his deceased relative, Thavarajah Thevarajah, who was the victim of an extrajudicial killing.

93. Thavarajah Thevarajah was a civilian killed by the SLA or other Sri Lankan security forces outside of any battlefield and without any legitimate military objective.  Her killing constituted a war crime under international law and a violation of the TVPA.

94. Defendant RAJAPAKSA, as President of Sri Lanka, exercised command responsibility over the SLA and all other Sri Lankan security forces at all

times relevant to this Complaint either directly, through his brother, Sri Lankan Defense Secretary Gotabaya Rajapaksa, or otherwise.

95. Defendant RAJAPAKSA knew or should have known that the extrajudicial killing of Thavarajah Thevarajah would take place under color of Sri Lankan law and would constitute a war crime before the fact, but made no effort to prevent the crime; or, the Defendant knew or should have known about the extrajudicial killing of Thavarajah Thevarajah after the fact but did nothing to punish the perpetrators.

96. Seeking a remedy for the extrajudicial killing of Thavarajah Thevarajah in Sri Lanka would be futile because Defendant RAJAPAKSA has politically compromised the judicial system there.    Further,   the   Plaintiff AIYATHURAI, or his agents, would risk death by setting foot in Sri Lanka.

97. The extrajudicial killing of Thavarajah Thevarajah violated the Torture Victims Protection Act of 1991, Pub. L. 102-256, 106 Stat. 73 (Mar. 12, 1992).   The killing has proximately caused cognizable damage to the Plaintiff in excess of $5 million.

## COUNT VI:  TORTURE VICTIMS PROTECTION ACT VIOLATION

98. The Plaintiffs re-allege paragraphs 1-97.

99. Plaintiff JEYAKUMAR AIYATHURAI is the legal representative under applicable law of his deceased relative, Kethika Thevarajah, who was the victim of an extrajudicial killing.

100.    Kethika Thevarajah was a civilian killed by the SLA or other Sri Lankan security forces outside of any battlefield and without any legitimate military objective. Her killing constituted a war crime under international law and a violation of the TVPA.

101.    Defendant RAJAPAKSA, as President of Sri Lanka, exercised command responsibility over the SLA and all other Sri Lankan security forces at all times relevant to this Complaint either directly, through his brother, Sri Lankan Defense Secretary Gotabaya Rajapaksa, or otherwise.

102.    Defendant RAJAPAKSA knew or should have known that the extrajudicial killing of Kethika Thevarajah would take place under color of Sri Lankan law and would constitute a war crime before the fact, but made no effort to prevent the crime; or, the Defendant knew or should have known about the extrajudicial killing of Kethika Thevarajah after the fact but did nothing to punish the perpetrators.

103.    Seeking a remedy for the extrajudicial killing of Kethika Thevarajah in Sri Lanka would be futile because Defendant RAJAPAKSA has politically compromised the judicial system there. Further, the Plaintiff AIYATHURAI, or his agents, would risk death by setting foot in Sri Lanka.

104.     The extrajudicial killing of Kethika Thevarajah violated the Torture Victims Protection Act of 1991, Pub. L. 102–256, 106 Stat. 73 (Mar. 12, 1992).   The killing has proximately caused cognizable damage to the Plaintiff in excess of $5 million.

## PRAYER FOR RELIEF

105.     Plaintiff MANOHARAN demands judgment on Count I and compensatory damages according to proof and other relief that this Court finds just and equitable, including costs and fees.

106.     Plaintiff LAVAN demands judgment on Count II and compensatory damages of according to proof and other relief that this Court finds just and equitable, including costs and fees.

107.     Plaintiff AIYATHURAI demands judgment on Counts III-VI and compensatory damages according to proof and other relief that this Court finds just and equitable, including costs and fees.

## JURY TRIAL

Plaintiffs demand a jury trial on all counts

DATE: JANUARY 28, 2011

Respectfully Submitted,

**COMPLAINT - 28**

BY: _____

BRUCE FEIN
District of Columbia Bar No. 446615
1025 Connecticut Ave., NW, Ste 1000
Washington, D.C. 20036
Telephone: (703) 963-4968
Facsimile: (202) 478-1664
Email: bruce@thelichfieldgroup.com
Attorney for Plaintiffs Kasippilai Manoharan,
Kalaiselvi Lavan, and Jeyakumar Aiyathurai